1  Adam M. Apton (State Bar No. 316516)
2  Email: aapton@zlk.com
   **LEVI & KORSINSKY, LLP**
3  515 South Flower Street, 18th & 19th Floors
   Los Angeles, CA 90071
4  Telephone: (213) 985-7290
   Facsimile: (212) 363-7171
5
6  Counsel for Plaintiff Ned Habedus
7  [*Additional Counsel listed on Signature Block*]

*REDACTED VERSION OF
DOCUMENT PROPOSED TO BE
FILED UNDER SEAL*

8              **UNITED STATES DISTRICT COURT**
              **CENTRAL DISTRICT OF CALIFORNIA**
9

10  NED HABEDUS, derivatively on behalf of       Case No. 2:25-cv-7171
11  MATCH GROUP, INC.,

12              Plaintiff,
                                                  **DEMAND FOR JURY TRIAL**
13          v.

14  BERNARD KIM, GARY SWIDLER,
    STEPHEN BAILEY, MELISSA BRENNER,
15  SHARMISTHA DUBEY, LAURA JONES,              **VERIFIED STOCKHOLDER**
    ANN L. McDANIEL, THOMAS J.                 **DERIVATIVE COMPLAINT**
16  McINERNEY, WENDI MURDOCH,
    SPENCER RASCOFF, GLENN H.
17  SCHIFFMAN, PAMELA S. SEYMON, and
18  ALAN G. SPOON,

19              Defendants,

20          -and-

21
    MATCH GROUP, INC.,
22
                Nominal Defendant.
23

24

25      Plaintiff Ned Habedus ("**Plaintiff**"), derivatively on behalf of Nominal Defendant Match

26  Group, Inc. ("**Match**," "**Match Group**," or the "**Company**"), brings this Verified Stockholder

27  Derivative Complaint against defendants herein for breaches of fiduciary duties as officers and/or

directors of Match and violations of Sections 10(b), 14(a), and 21D of the Securities Exchange Act of 1934, as amended (the "**Exchange Act**") during the period from May 2, 2023 through the present (the "**Relevant Period**"). Plaintiff's allegations are based upon his own personal knowledge as to himself and his own acts; and as to all other matters, upon information and belief based upon, *inter alia*, the investigation of counsel, review of publicly available information, ███ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████ Plaintiff believes that substantial evidentiary support for the allegations herein exists and will become known following a reasonable opportunity for discovery.

## NATURE AND SUMMARY OF THE ACTION

1.     Match owns and operates a number of online dating platforms including Tinder, Match.com, OkCupid, and Hinge. The Company derives most of its revenue through subscription services, online advertising, and in-app purchases related to IT platform products. Match's principal metrics for evaluating and disclosing the performance are each platform's number of monthly active users ("**MAU**") and average revenue per user ("**ARPU**").

2.     On May 2, 2023, the Company published a shareholder letter (the "**Q1 2023 Shareholder Letter**") announcing its financial results for the first quarter of the fiscal year ended December 31, 2023 (the "**2023 Fiscal Year**") which discussed Tinder's performance and its ability to bring back users who have "lapsed," stating in relevant part that:

> While Tinder is an iconic brand used by many, our data shows that approximately 40% of eligible singles age 18 to 34 in North America and Europe are still not using Tinder, and an additional approximately 35% have used Tinder previously, but not in the last year ("lapsed users"). This provides ample opportunity for Tinder to

bring both singles who have never tried the app and lapsed users into the fold. ***Tinder has a strong history of reactivating lapsed users, and the large pool of lapsed users provides significant opportunity to increase reactivations. The way for Tinder to attract new and lapsed users is to deliver exciting features and a product experience that resonates. We're confident that as Tinder does so, it can both return to stronger new user growth and reactivate the large population of lapsed users, which will ultimately drive revenue growth***.[1]

3.    The Q1 2023 Shareholder Letter, and subsequently the Company's other disclosures during the Relevant Period, downplayed the significant challenges facing Match, particularly the decline in MAU on the Tinder platform, and the mounting safety concerns that plagued Tinder. The challenges included well-documented allegations that Tinder served as a haven for bad actors to prey on women. Despite being aware of numerous sexual assault complaints and systemic safety deficiencies since at least 2019, Match Group failed to effectively ban dangerous individuals. In one particularly egregious case, a user reported for sexual assault continued to have access to Tinder for over two years after the Company was informed.

4.    The Company's ineffective moderation practices, dismantling of its trust-and-safety team, and abandonment of background check initiatives enabled known predators to rejoin Tinder with ease, fostering a dangerous environment that eroded user trust and contributed to declining MAU. Rather than confront these issues, the Company's board of directors (the "**Board**") and senior management concealed them, issuing materially false and misleading statements concerning user safety and platform performance—thereby breaching their fiduciary duties and harming the Company's stockholders when the Company's stock price sharply dropped when the truth eventually emerged.

_____

[1] Unless otherwise stated, all emphasis in quotations has been added.

5.      The truth began to emerge on November 6, 2024, when Match published a shareholder letter (the "**Q3 2024 Shareholder Letter**") announcing the Company's financial results for the third quarter of the fiscal year ended December 31, 2024 (the "**2024 Fiscal Year**"). The Q3 2024 Shareholder Letter revealed, *inter alia*, that "Tinder MAU was down 9% Y/Y in Q3, which was the same rate of decline as in Q2, falling short of our expectations for continued improvement in Y/Y trends."   On this news, the Company's stock price fell $6.77 per share, or 17.8%, from a closing price of $37.88 per share on November 6, 2024 to close at $31.11 per share on November 7, 2024.

6.      Competition or economic considerations did not cause the rapid decline in Tinder's MAU. It faltered because users had grown tired of meeting abusers and predators on the platform. Users also were frustrated by the Company's failure to curtail this nefarious conduct, which was known to the Company's leadership.

7.      Following the November 2024 revelations about Company's declining MAU, on February 13, 2025, The Pulitzer Center in partnership with *The Guardian*, *The 19th, The Markup* (now part of *CalMatters*), and *NPR* published the results of their 18-month investigation in a scathing exposé titled *Dating App Cover-Up: How Tinder, Hinge, and Their Corporate Owner Keep Rape Under Wraps* (the "**Dating Project Report**").[2] This exposé confirmed that that there was no "dispute that Match Group has carefully documented the extent of harm on the company apps for years without sharing that information to the public." *Id*.

---

[2] Emily E. Dugdale & Hanisha Harjani, *Rape Under Wraps: How Tinder, Hinge and Their Corporate Owner Chose Profits Over Safety*, THE MARKUP (Feb. 13, 2025), https://themarkup.org/investigations/2025/02/13/dating-app-tinder-hinge-cover-up.

8.      Internal Company documents cited in the Dating Project Report, ████████ ██████████████████████████████████ confirmed that the Company's leadership knew about these nefarious practices for years:

> Match Group has known for years which users have been reported for drugging, assaulting, or raping their dates since at least 2016[.] **Since 2019, Match Group's central database has recorded every user reported for rape and assault across its entire suite of apps; by 2022, the system known as Sentinel, was collecting hundreds of troubling incidents every week, company insiders say**.

9.      The Dating Project Report further revealed that the Company's leadership knew about the problems, promised to disclose information about it, but failed to follow through:

> [Match] promised in 2020 that it would release what's known as a transparency report – a public document that would reveal data on harm occurring on and off its platforms. If the public were aware of the scale of rape and assault on Match Group apps, they would be able to accurately assess their risks. **As of February 2025, the report has not been released**.

10.      Accordingly, during the Relevant Period, the Company's responsible officers and directors breached their fiduciary duties by personally making and/or causing the Company to make a series of materially false and misleading statements to the investing public regarding Match Group's business, operations, and prospects.

11.      Specifically, they willfully or recklessly misrepresented and/or omitted material facts by failing to disclose, *inter alia*, that: (*i*) Match failed to adequately address Tinder's known safety issues, including its failure to keep banned users off the platform; (*ii*) relatedly, the Company was experiencing undisclosed, significant challenges in driving user growth on Tinder than publicly acknowledged; (*iii*) as a result, there was a substantial risk that Tinder's MAU would not rebound in time for the Company's third quarter 2024 financial reporting; (*iv*) Tinder also was struggling with declining ARPU; and (*v*) the Individual Defendants (defined below) were

motivated by their own self-interest in seeking stockholder approval of the Company's 2024 Stock and Annual Incentive Plan (the "**2024 Stock Plan**") to increase their future compensation. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis throughout the Relevant Period.

12.　　In light of the Individual Defendants' misconduct—which has subjected the Company as well its former CEO and President (who are defendants herein) to a federal securities fraud class action lawsuit pending in the United States District Court for the Central District of California captioned *Meslage v. Match Group, Inc. et al.*, 2:24-cv-10153 (the "**Securities Class Action**"), the Company now faces significant financial and reputational consequences. This misconduct caused the Company to undertake costly internal investigations, implement enhanced internal controls, and absorb substantial losses. As a result, the Company will be forced to expend many millions of dollars in remediation and defense costs as a result of the Individual Defendants' breaches of fiduciary duties and other misconduct.

## JURISDICTION AND VENUE

13.　　This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Section 10(b) of the Exchange Act (15. U.S.C. § 78j(b)), and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

14.　　This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

15.　　This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

16.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, one or more of the Defendants either resides or maintains executive offices in this District, Defendants have conducted business in this District, Defendants' actions have had an effect in this District, and Match is headquartered in this District.

## PARTIES

*Plaintiff*

17.     Plaintiff is a current shareholder of Match and has continuously held Match common stock at all relevant times.

*Nominal Defendant*

18.     Match is a Delaware corporation with principal executive offices in Dallas, Texas. Match's common stock trades on the Nasdaq under the ticker symbol "MTCH."

*Individual Defendants*

19.     Defendant Bernard Kim ("**Kim**") has served as Match's CEO and as a Company director from May 2022 until February 2025. For the 2023 Fiscal Year, he received $16,080,272 in total compensation from the Company. His total compensation from the Company for the 2024 Fiscal Year was $15,746,295.

20.     Defendant Gary Swidler ("**Swidler**") has served as the Company's President since from January 2023 through April 1, 2025, as well as its CFO from September 2015 through March 1, 2025 and its COO from March 2020 through January 2023. For the 2023 Fiscal Year, he received $12,993,695 in total compensation from the Company. His total compensation from the Company for the 2024 Fiscal Year was $7,817,924.

21.     Defendant Stephen Bailey ("**Bailey**") has served as a Company director since June 2020, serves on the Board's Audit Committee ("**Audit Committee**"). For the 2023 Fiscal Year,

Defendant Bailey received $309,973 in total compensation from the Company. His total compensation from the Company for the 2024 Fiscal Year was $309,972.

22.    Defendant Melissa Brenner ("**Brenner**") has served as a Company director since June 2020. For the 2023 Fiscal Year, she received $304,973 in total compensation from the Company. Her total compensation from the Company for the 2024 Fiscal Year was $304,972.

23.    Defendant Sharmistha Dubey ("**Dubey**") has served as a Company director since September 2019. For the 2023 Fiscal Year, she received $299,973 in total compensation from the Company. Her total compensation from the Company for the 2024 Fiscal Year was $292,972.

24.    Defendant Laura Jones ("**Jones**") has served as a Company director since March 2024 . Her total compensation from the Company for the 2024 Fiscal Year was $288,599.

25.    Defendant Ann L. McDaniel ("**McDaniel**") has served as a Company director since December 2015. For the 2023 Fiscal Year, she received $329,973 in total compensation from the Company. Her total compensation from the Company for the 2024 Fiscal Year was $329.972.

26.    Defendant Thomas J. McInerney ("**McInerney**") has served as the Chairman of the Board since May 2021, and has been a Company director since November 2015. For the 2023 Fiscal Year, he received $389,973 in total compensation from the Company. His total compensation from the Company for the 2024 Fiscal Year was $392,472.

27.    Defendant Wendi Murdoch ("**Murdoch**") served as a Company director from June 2020 until the annual meeting on June 21, 2024. For the 2023 Fiscal Year, Defendant Murdoch received $319,973 in total compensation from the Company. Her total compensation from the Company for the 2024 Fiscal Year was $288,599.

28.     Defendant Spencer Rascoff ("**Rascoff**") has served as a Company director since March 2024 and as the Company's CEO since February 2025. His total compensation from the Company for the 2024 Fiscal Year was $288,599.

29.     Defendant Glenn Schiffman ("**Schiffman**") has served as a Company director since September 2016 and serves as a member of the Audit Committee. For the 2023 Fiscal Year, Defendant Schiffman received $299,973 in total compensation from the Company. His total compensation from the Company for the 2024 Fiscal Year was $302,472.

30.     Defendant Pamela S. Seymon ("**Seymon**") has served as a Company director since November 2015. For the 2023 Fiscal Year, Defendant Seymon received $304,973 in total compensation from the Company. Her total compensation from the Company for the 2024 Fiscal Year was $304,972.

31.     Defendant Alan G. Spoon ("**Spoon**") has served as a Company director from November 2015 through June 2025. Between November 2015 and June 2025, he served as Chair of the Audit Committee. For the 2023 Fiscal Year, Defendant Spoon received $334,973 in total compensation from the Company. His total compensation from the Company for the 2024 Fiscal Year was $334,972.

32.     Defendants Kim, Swidler, Bailey, Brenner, Dubey, Jones, McDaniel, McInerney, Murdoch, Rascoff, Schiffman, Seymon, and Spoon are collectively referred to as the "**Individual Defendants**."

## THE AUDIT COMMITTEE CHARTER

33.     The Audit Committee's Charter ("**Audit Committee Charter**") states that the purpose of the Audit Committee is to ensure:

> (i) the integrity of the financial statements of the Company, (2) the effectiveness of the Company's internal control over financial reporting, (3) the qualifications, performance and independence of

the independent registered public accounting firm (the "independent accounting firm"), (4) the performance of the Company's internal audit function, (5) the Company's risk assessment and risk management policies as they relate to financial and other risk exposures, and (6) the Company's compliance with legal and regulatory requirements.

34.    The Audit Committee Charter states that the duties of its members is to, among other things:

> Review and discuss with management and the independent accounting firm the annual audited financial statements, as well as disclosures made in management's discussion and analysis, and recommend to the Board whether the audited financial statements should be included in the Company's Form 10-K.

> Review and discuss with management and the independent accounting firm the Company's earnings press releases and the results of the independent accounting firm's review of the quarterly financial statements.

> Discuss with management and the independent accounting firm significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements, including any significant changes in the Company's selection or application of accounting principles.

> Review and discuss with management and the independent accounting firm any major issues as to the adequacy of the Company's internal controls, including any significant deficiencies in the design or operation of internal controls or material weaknesses therein and any fraud involving management or other employees who have a significant role in the Company's internal controls, any special steps adopted in light of these issues and the adequacy of disclosures about changes in internal control over financial reporting.

> * * *

> Discuss with management the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures, including the Company's risk assessment and risk management policies.

> * * *

Discuss with management, the Company's senior internal auditing executive and the independent accounting firm the Company's and its subsidiaries' compliance with applicable legal requirements and codes of conduct.

* * *

Discuss with the Company's Chief Legal Officer or General Counsel legal matters that may have a material impact on the financial statements or the Company's compliance policies.

## SUBSTANTIVE ALLEGATIONS

35.     Match is an online dating services provider that operates a number of platforms including Tinder, Match.com, OkCupid, and Hinge. Match generates the majority of its revenue from subscription services, online advertising, and in-app purchases.

36.     Match measures growth primarily through MAU on each of its platforms and utilizes both MAU and ARPU as key operating metrics in evaluating platform performance. The Company routinely highlights these metrics in its SEC filings and public disclosures to communicate growth trends and platform success to investors.

37.     Among its portfolio of platforms, Tinder is the Company's most significant revenue driver, having consistently accounted for more than half of Match's direct revenue over the past three fiscal years.

38.     Throughout the Relevant Period, the Individual Defendants failed to adequately address persistent safety issues on the Tinder platform and materially understated the Company's challenges in maintaining and growing Tinder's MAU.

39.     Even more egregiously, the Individual Defendants knowingly operated an unsafe business model that predators used to target and harm women nationwide. The Dating Project Report revealed that Match failed to implement and enforce adequate safety measures to protect users from sexual predators, and routinely allowed known offenders to regain access to its

platforms, thereby exposing users to additional harm and described the Company's failure to implement meaningful safety protocols.

40.    The Dating Project Report concluded the Company's safety initiatives were inadequate and stagnant, despite public promises to enhance user safety and increase transparency through data sharing. The Dating Project Report further stated the following regarding the Company's knowledge of sexual abuse facilitated by its platforms:

> Match Group has known for years which users have been reported for drugging, assaulting, or raping their dates since at least 2016, according to internal company documents. Since 2019, Match Group's central database has recorded every user reported for rape and assault across its entire suite of apps; by 2022, the system, known as Sentinel, was collecting hundreds of troubling incidents every week, company insiders say. Match Group promised in 2020 that it would release what's known as a transparency report — a public document that would reveal data on harm occurring on and off its platforms. If the public were aware of the scale of the rape and assault on Match Group apps, they would be able to accurately assess their risk. As of February 2025, the report has not been released.

41.    The Dating Project Report further found that Match failed to take meaningful action to improve user safety, and revealed that core trust-and-safety functions had been outsourced to third-party contractors, raising serious concerns about the Company's commitment to protecting users and maintaining adequate internal oversight over safety operations:

> Since 2021, Match Group has publicly promised to improve the Safety of their products and share data, but company insiders say safety has not improved. A brief hiring spree sparked by congressional and media scrutiny has been largely scaled back, according to former employees. In 2024, the remaining employees from the central trust-and-safety team Match Group set up in response to the increased scrutiny were let go and their jobs outsourced to overseas contractors.
>
> Our review of hundreds of pages of internal company documents, Along with thousands of pages of court records, securities filings, and analyst reports, coupled with dozens of interviews with current

and former employees and survivors of sexual violence found women who report being raped get no traction, while accused rapists...keep swiping — and assaulting.

42.     As part of the 18-month investigation culminating in the Dating Project Report, investigators tested whether Match could effectively ban users not only from Tinder following reports of abusive conduct, but also enforce cross-platform bans across its entire suite of platforms. The Dating Project Report documented that known abusers were able to regain access to the platforms with ease—without even changing their names—thereby demonstrating the ineffectiveness of the Company's enforcement and user safety mechanisms:

Starting in April 2024, The Dating Apps Reporting Project created a series of Tinder accounts that we subsequently reported for sexual assault. Soon after, Tinder banned the accounts, and we started investigating how easy it would be for a banned user to create new accounts.

From the investigator's tests, banned users were able to rejoin Tinder after receiving a ban, and banned users were able to join other apps across Match's platforms, contrary to the Company's safety policies. Getting around a ban to sign up for a new account required non-technical knowledge and users' "key" personal information could still be included. The report stated:

Repeatedly, we found that users, soon after being banned, could create new Tinder accounts with the exact same name, birthday, and profile photos used on their banned accounts. Users banned from Tinder were also able to sign up for many other Match platforms] without changing those personal details.

To get around the Tinder ban, we used techniques commonly suggested by online guides and forums that don't require lot of technical knowledge to understand. We were able to verify three techniques that allowed banned Match Group users to repeatedly bypass being flagged when creating new accounts.

Our own testing on Match Group apps shows that as of February 2025, not much has changed. Banned Tinder users, including those reported for sexual assault, can easily rejoin or move to another Match Group dating app, all while keeping most of their key personal information exactly the same.

43.     In one particularly outrageous example cited in the Dating Project Report, cardiologist Stephen Matthews—retained access to Match's platforms as late as January 25, 2023, despite a user reporting him for sexual assault on September 28, 2020. Match only removed his profile after he was arrested by law enforcement, by which time he had raped at least 14 more women.  As noted in the Dating Project Report,

> On Oct. 25, 2024, <u>a Denver judge sentenced Matthews to 158 years to life in prison</u> after a jury convicted him of 35 counts related to drugging and sexually assaulting eight women, drugging two women, and assaulting one more for a total of 11 women. Attorneys for the women said much of that violence could have been prevented.

44.     While the Dating Project Report found that the Company purported to apply certain safety measures intended to protect users, they were wholly ineffective, largely performative and failed to prevent dangerous individuals like Matthews from continuing to exploit the platform:

> Match Group brought in a new vice president to head trust and safety whose job partly focuses on complying with increased global transparency requirements. The company is experimenting with requiring faces in photos and rolled out a "Share My Date" feature so you can be tracked while meeting up with an online stranger. On Tinder, it orchestrated a "major ecosystem cleanup" geared toward identifying fake profiles and getting scammers off the app.

> But neither the cleanup nor tracking a date from your phone would have stopped Matthews - a man who never sought to hide his identity, who assaulted his dates in his own home - from finding and harming women.

45.     Match has brazenly ignored countless dangerous individuals, like the convicted serial rapist Stephen Matthews, lurking on its platforms, despite shamefully knowing for years—and still knowing—that embracing greater transparency would drastically bolster user safety. Yet, Match persisted in withholding critical safety information, thereby leaving users vulnerable to harm. Indeed, the Dating Project Report disclosed that Match shockingly knew that "thousands" of fiends polluted its platforms:

> [T]he [C]ompany knew about Matthews, and it knows about thousands of other abusive users. It has the data that could help avoid dangerous situations, but it hasn't shared it, leaving millions of people in the dark.

> The reality is that if Stephen Matthews were released today, he could get right back on a dating app. Match knows this.

46. Evidencing management and the Board's bad faith, they took actions confirming that they knew there was a problem but intentionally failed to follow through because of financial reasons. Notably, amid heightened public and congressional scrutiny in 2020, Match appointed a high-profile safety executive, Tracey Breeden, and established a dedicated trust-and-safety team. But by 2024, the team had been largely dismantled, with remaining staff terminated and their responsibilities outsourced to overseas contractors. The Dating Project Report reports that the Company's abandonment of the safety project—despite knowing that the sexual predator problem persisted—was driven by the desire to reduce operating expenses, reflecting a deliberate decision by the Company's fiduciaries to prioritize profitability over user safety.

47. Demonstrating that both management and the Board ignored a growing safety crisis, the Dating Project Report identified numerous red flags that were disregarded by Company leadership. Among the most damning revelations in Dating Project Report was that the Company had known since at least 2016 which "users have been reported "for drugging, assaulting or raping their dates, according to internal company documents," yet took no meaningful action to prevent these individuals from continuing to use the platforms.

48. The Dating Project Report revealed that since 2019, Match's internal database has tracked every user reported for rape and assault across its entire portfolio of dating platforms. By 2022, this system—referred to internally as "Sentinel"—was logging hundreds of serious incidents

each week, according to Company insiders. Despite the alarming volume of reports, the Company failed to implement adequate safeguards to address or mitigate these threats.

49.    In 2020, Match committed to releasing a transparency report, which was promised to be "a public document that would reveal data on harm occurring on and off its platforms" and inform the public about the scope of safety issues across Match's services. The Company, however, failed to release the transparency report (assuming it was ever created), further concealing the extent of the risks that users face by using Match's platforms.

50.    The Dating Project Report revealed internal documentation showing that Match's primary concern was not the safety of its users, but the regulatory consequences of public disclosure. Specifically, members of management expressed concern that releasing information about a harmful incident in one jurisdiction would trigger obligations to disclose similar information in other jurisdictions. This evidenced a calculated effort to promote opacity rather than the transparency to confront and address the pervasive abuse occurring on its platforms.

51.    The Dating Project Report cited insiders who acknowledged that the Company was obsessed with financial metrics as opposed to safety. For example, the Dating Project Report disclosed that an insider asked in an internal memo uncovered by *ProPublica,* "how much would you personally pay to stop just one person being sexually assaulted by a date, one child being trafficked or one vulnerable person being driven to suicide by a predator? I feel that if I asked members of our staff that question individually, they would put a high value of their own money on it-but as a group nobody is ready to hear that yet."

52.    The Dating Project Report revealed that in 2024, the remaining employees from Match's central trust-and-safety team—originally established in response to heightened public and regulatory scrutiny—were either laid off or replaced by overseas contractors. This decision was

reportedly driven by Defendant Kim's wish to cut costs, reflecting a prioritization of short-term financial performance over user safety and platform integrity.

53.     The Dating Project Report noted that that as of February 2025, users previously banned from Tinder remained active on the platform and could easily rejoin or migrate to other Match platforms. This glaring deficiency in enforcement mechanisms was known—or should have been known—to the Defendants.

54.     For example, in April and May 2024, and again in January and February 2025, reporters created 50 test accounts to assess the effectiveness of Match's banning protocols. While Tinder typically banned users reported for in-person misconduct within two days, those same users were able to regain access by either creating new accounts or reactivating prior ones. Reporters followed instructions from publicly available online forums and guides, which described common methods for circumventing bans. Notably, they were able to successfully create new accounts without altering basic identifiers such as name, birthdate, or profile photo. The existence and accessibility of these bypass techniques were publicly known—and therefore known or readily knowable to Company management—yet Match took no apparent action to remediate these enforcement failures.

55.     The Dating Project Report provided direct evidence that users banned from Tinder—including individuals reported for assault—were able to easily create new accounts using the same personal information, or migrate to other Match platforms such as Hinge. Former Match employees confirmed the Company lacked any meaningful cross-platform ban enforcement, a longstanding internal issue that was well known within the Company but never effectively addressed.

56.    These failures carry serious implications: Company management was aware of the technical loopholes, as they were readily observable through routine moderation workflows and repeated enforcement failures—not to mention discussed online in various forums and chat groups. The Board should have been informed of these vulnerabilities through updates from management. This breakdown in oversight and the absence of corrective action enabled dangerous sexual predators—including convicted rapists such as Stephen Matthews—to continue exploiting Match's platforms to harm users.

57.    Management's failure to implement robust banning and enforcement mechanisms—combined with the Board's failure to demand appropriate technological remedies—demonstrates actual or, at minimum, constructive knowledge of the problem, coupled with a conscious decision not to act. This sustained inaction reflects a systemic failure at both the management and board levels to prioritize user safety, despite the presence of clear and persistent red flags.

58.    The Dating Project Report's account of the dismantling of Match's safety initiatives is further evidence of Board inaction and complicity. In 2020, Match appointed Tracey Breeden as Head of Safety and established a centralized trust-and-safety team in response to escalating public and regulatory scrutiny. However, by 2024, this team had been largely dismantled, with key personnel laid off and their responsibilities outsourced to overseas contractors, thereby substantially weakening the Company's internal safety infrastructure. Furthermore, the Company's partnership with Garbo—a background check service launched in 2022 to improve user screening—was abruptly terminated in 2023, further undermining the Company's previously touted safety initiatives and reinforcing the Board's failure to maintain a meaningful commitment to user protection.

59.     The Company's initial investment in user safety measures—including the appointment of a Head of Safety, the formation of a dedicated trust-and-safety team, and the launch of the Garbo background check partnership—demonstrates that both management and the Board were fully aware of the ongoing and serious threat posed by bad actors on the platform. However, the subsequent dismantling of these initiatives—driven by cost-cutting pressures and investor demands—reflects a deliberate choice to deprioritize user safety, despite the fact that the risks remained persistent, well-documented, and foreseeable.

60.     As a matter of practice, the Board approved budget cuts that directly impacted critical safety resources, while management executed those reductions with full knowledge that doing so would materially weaken protections against known and foreseeable threats, including sexual predators. This coordinated failure reflects a conscious and deliberate disregard for user safety at both the oversight and operational levels of the Company.

### MANAGEMENT AND THE BOARD CAUSED THE COMPANY TO ISSUE FALSE AND MISLEADING STATEMENTS

61.     Under Delaware law articulated in *Malone v. Brincat*, 722 A.2d 5 (Del. 1998), directors of a Delaware corporation owe shareholders fiduciary duties of loyalty and good faith to provide accurate and complete information when communicating matters that affect shareholders' voting rights. A *Malone* claim arises when directors knowingly disseminate false or misleading information that impairs shareholders' ability to make informed decisions in connection with corporate elections or other matters requiring shareholder action, even where there is no direct solicitation. The allegations against Match's Board and senior management—concerning materially false and misleading statements in the Company's 2023 and 2024 Proxy Statements, shareholder letters, SEC filings, and earnings calls—support a *Malone* claim. These communications knowingly misrepresented and omitted material facts regarding Tinder's

persistent safety issues and declining MAU, thereby undermining shareholders' ability to exercise their voting rights in an informed and meaningful manner.

***May 2, 2023 Shareholder Letter***

62.    On May 2, 2023, Match published the Q1 2023 Shareholder Letter, disclosing its financial and operational results for the first quarter of the 2023 Fiscal Year. In its discussion of the Tinder's user growth over the first quarter, the Q1 2023 Shareholder Letter stated, *inter alia*:

> While Tinder is an iconic brand used by many, our data shows that approximately 40% of eligible singles age 18 to 34 in North America and Europe are still not using Tinder, and an additional approximately 35% have used Tinder previously, but not in the last year ("lapsed users"). This provides ample opportunity for Tinder to bring both singles who have never tried the app and lapsed users into the fold. ***Tinder has a strong history of reactivating lapsed users, and the large pool of lapsed users provides significant opportunity to increase reactivations. The way for Tinder to attract new and lapsed users is to deliver exciting features and a product experience that resonates. We're confident that as Tinder does so, it can both return to stronger new user growth and reactivate the large population of lapsed users, which will ultimately drive revenue growth***.

2023 Proxy Statement

63.    On May 2, 2023, Match filed its Schedule 14A the Company filed with the SEC (the "**2023 Proxy Statement**"). Defendants Kim, Bailey, Brenner, Dubey, McDaniel, McInerney, Murdoch, Schiffman, Seymon, and Spoon solicited the 2023 Proxy Statement, which contained material misstatements and omissions.

64.    The 2023 Proxy Statement solicited shareholders to, *inter alia*: (*i*) reelect Defendants Dubey, McDaniel, and McInerney to the Board for a three-year term; (*ii*) approve, on an advisory basis, executive compensation; and (*iii*) to ratify the appointment Ernst & Young LLP ("**EY**") as the Company's independent registered public accounting firm for the 2023 Fiscal Year.

65.     Regarding the Company's "Corporate Governance Guidelines, Committee Charters, and Code of Business Conduct and Ethics," the 2023 Proxy Statement stated that:

> As part of its ongoing commitment to good corporate governance, the Board has codified its corporate governance practices into a set of Corporate Governance Guidelines and has also adopted written charters for each of the committees of the Board. Match Group has also adopted a Code of Business Conduct and Ethics for directors, officers (including our principal executive officer, principal financial officer and principal accounting officer) and employees. The Corporate Governance Guidelines, Audit Committee Charter, Compensation and Human Resources Committee Charter, Nominating and Corporate Governance Committee Charter, and Code of Business Conduct and Ethics are available in the Corporate Governance section of our website at *http://ir.mtch.com*.

66.     Regarding "Risk Oversight," the 2023 Proxy Statement stated that:

> The Board's role in risk oversight of the Company is consistent with Match Group's leadership structure, with the Chief Executive Officer and other members of senior management having responsibility for assessing and managing the Company's risk exposure, and the Board and its committees providing oversight in connection with these efforts. Match Group management, including our Senior Vice President, Internal Audit, and our Risk, Controls and Compliance team, is responsible for assessing and managing Match Group's exposure to various risks on a day-to-day basis, which responsibilities include the conduct of an enterprise risk assessment of short-term, long-term and emerging risks, testing of key controls and procedures, and creation of appropriate risk management programs and policies. Management has developed and implemented guidelines and policies to identify, assess and manage significant risks facing the Company. In developing this framework, Match Group recognizes that leadership and success are impossible without taking risks; however, the imprudent acceptance of risks or the failure to appropriately identify and mitigate risks could adversely impact stockholder value. The Board is responsible for overseeing management in the execution of its responsibilities and for assessing Match Group's approach to risk management. While the Board's oversight focuses on all material risks, the Board may focus more frequently on immediate areas of concern that represent significant emerging risks as identified by management.

67.     Defendants Kim, Bailey, Brenner, Dubey, McDaniel, McInerney, Murdoch, Schiffman, Seymon, and Spoon caused the 2023 Proxy Statement to be false and misleading by

1   failing to disclose, *inter alia*, that: (*i*) Match failed to adequately address Tinder's known safety

2   issues, including its failure to keep banned users off the platform; (*ii*) relatedly, the Company was

3   experiencing undisclosed, significant challenges in driving user growth on Tinder than publicly

4   acknowledged; (*iii*) as a result, there was a substantial risk that Tinder's MAU would not rebound

5   in time for the Company's third quarter 2024 financial reporting; and (*iv*) Tinder also was

6   struggling with declining ARPU. As a result of the foregoing, the Company's public statements

7   were materially false and misleading and/or lacked a reasonable basis at all relevant times.

8   68.     As a result of Defendants Kim, Bailey, Brenner, Dubey, McDaniel, McInerney,

9   Murdoch, Schiffman, Seymon, and Spoon causing the 2023 Proxy Statement to be false and

10   misleading, shareholders voted, *inter alia*, to: (*i*) reelect Defendants Dubey, McDaniel, and

11   McInerney to the Board for an additional three-year term, thereby allowing them to continue

12   breaching their fiduciary duties to the Company; (*ii*) approve, on a nonbinding advisory basis, the

13   compensation of Match's executive officers; and (*iii*) ratify the appointment of EY as the

14   Company's independent registered public accounting firm for the 2023 Fiscal Year.

15   69.     ██████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

70.

71.

**August 3, 2023 Form 10-Q**

72.     Match filed its Form 10-Q for the period ended June 30, 2023 on August 3, 2023. The filing failed to disclose specific safety issues affecting Tinder, including the presence of known predators on the platform, user complaints involving sexual assault, and deficiencies in the Company's ban enforcement mechanisms. The Form 10-Q also omitted any discussion of user dissatisfaction arising from these safety concerns, thereby rendering the Company's risk disclosures and management commentary materially incomplete and misleading.

73.     Specifically, the Form 10-Q contains only general and boilerplate risk disclosures and omits any meaningful discussion of safety issues on Tinder. Instead, the filing focuses primarily on financial performance metrics, accounting policies, tax provisions, financial instruments, and long-term debt. Its standard risk factor language fails to reference the presence of bad actors on the platform, inadequate content moderation systems, or the impact that unresolved

safety concerns were having on user growth and engagement, rendering the disclosure materially incomplete.

74.     For example, Note 1—"The Company and Summary of Significant Accounting Policies" (Page 11) of the Form 10-Q—describes Match's portfolio (including Tinder) and reiterates the Company's stated mission to help users form meaningful connections. It highlights the global reach of Match's platforms, which operate in over 40 languages, but fails to mention any of the significant safety challenges facing Tinder, including the presence of predators, user trust issues, or the impact of such issues on user engagement and platform integrity.

75.     In the SOX certifications, Defendants Kim and Swidler attest that the filing contains no untrue statements of material fact and fairly presents Match's financial condition and results of operations. These SOX certifications also assert that the Company maintained effective disclosure controls and internal controls over financial reporting. However, the certifications omit any reference to the significant safety-related deficiencies impacting Tinder, including known issues involving predator access, failure to enforce bans, and user trust erosion, thereby calling into question the accuracy and completeness of the Company's internal controls and disclosure representations.

76.     The August 3, 2023 10-Q does not include a dedicated "Risk Factors" section, as is typical in quarterly reports, which often incorporate risk disclosures from the annual Form 10-K by reference.

77.     By the time that the August 3, 2023 Form 10-Q was filed, the Board and senior management had actual or constructive knowledge of pervasive safety issues affecting Tinder. These issues materially impacted user trust, retention, and the Company's financial performance and were well known through internal data, user complaints, public scrutiny, and mounting legal

exposure. Specifically, the Company was aware of the presence of predators and bad actors, insufficient content moderation, and systemic enforcement failures, all of which contributed to declining MAU and deteriorating platform integrity.

78.     Despite having actual or constructive knowledge of these material risks, the Individual Defendants failed to disclose them in the August 3, 2023 Form 10-Q or in the 2023 Proxy Statement, which had been filed just a few months earlier. Instead, they issued false and misleading statements that omitted critical safety-related information, thereby depriving shareholders of the information necessary to make informed voting and investment decisions. In doing so, Defendants breached their fiduciary duties of loyalty, candor, and good faith.

79.     The safety issues known to Defendants included widespread user complaints and reports of predatory behavior on Tinder dating back to at least 2019. As documented in the Dating Project Report, Match routinely received reports of sexual assault, which overwhelmed its under-resourced and inadequately supported moderation teams. For example, in 2020, users reported Denver-based cardiologist Stephen Matthews for rape, yet Match Group failed to ban him, allowing him to continue accessing Tinder and Hinge until 2023, when a police report filed by a survivor led to his conviction and a 158-year prison sentence. This case exemplifies the Company's repeated failure to act on credible reports of violent misconduct.

80.     Defendants were on notice of Tinder's safety issues through multiple high-profile investigations and heightened congressional scrutiny A 2019 *ProPublica* investigation revealed registered sex offenders were able to access Tinder due to the Company's lax screening protocols. Similarly, a 2020 *Four Corners* investigation publicly criticized Tinder for failing to respond to user reports of sexual assault and for allowing offenders to use the "unmatch" feature to evade

accountability and erase evidence of misconduct. These public findings further underscore the Individual Defendants' awareness of ongoing safety failures and their obligation to act.

81.    In 2020, federal lawmakers publicly questioned Match's safety practices, prompting the Company to issue public commitments to improve user protection across its platforms. These events were widely reported in the media and the subject of public discourse, ensuring that both the Board and senior management were aware of the persistent presence of predators on Tinder by no later than August 2023.

82.    The Individual Defendants were aware of internal data documenting incidents of harm on the Company's platforms, including reports of sexual assault, yet deliberately withheld a promised transparency report in 2020 that would have disclosed these issues to the public. The Dating Project Report cited insiders confirming that Match actively tracked this safety data, which was known to senior management and, by August 2023, was inevitably shared with the Board through the Company's risk oversight and reporting channels. This failure to disclose reflected a conscious decision to conceal material risks from shareholders and regulators, in violation of the Individual Defendants' fiduciary duties.

83.    The Individual Defendants were aware of the Company's ineffective ban enforcement protocols, which allowed reported predators to create new accounts on Tinder and other Company-owned platforms, such as Hinge, using the same personal details. Testing conducted as part of the investigation culminating in the Dating Project Report confirmed the existence of this critical loophole, citing as a specific example Stephen Matthews—who was promoted as a "standout" match on Hinge despite prior reports of rape. Management was aware of these operational failures through internal moderation reports, and the Board knew or should have known of these issues through updates from the technology or risk committees by August 2023.

The continued failure to remediate this known vulnerability underscores a systemic breakdown in oversight and a deliberate disregard for user safety.

84.     The Individual Defendants implicitly acknowledged the Company's safety deficiencies by hiring Tracey Breeden as Head of Safety in 2020 and launching a partnership with Garbo in 2022 to implement background checks on users. However, by August 2023, Match had terminated the Garbo partnership—a decision that was approved or overseen by both the Board and senior management—prioritizing cost-cutting over user safety despite full awareness of the ongoing risks. The Dating Project Report specifically noted this rollback, along with the subsequent dismantling of the trust-and-safety team by 2024, as further evidence that the Individual Defendants were aware of continuing safety failures and deliberately chose not to address them.

85.     The Individual Defendants were aware of significant legal and regulatory risks arising from the Company's safety failures, including a 2017 lawsuit against Match for failing to protect users from a known predator, and a 2022 bill in Congress calling for mandatory ID verification on dating apps. These developments were inevitably monitored by management through legal counsel and risk management channels, and were likely reported to the Board as part of its oversight responsibilities. By August 2023, these external signals further underscored the Company's exposure to liability stemming from its ongoing failure to implement adequate user safety protections..

86.     The Individual Defendants knew that safety issues drove user dissatisfaction, particularly among younger users and women, contributing to MAU declines. A 2023 Brigham Young University study cited in the Dating Project Report highlighted the violence of dating app-related assaults, a trend Match Group likely knew through user feedback and analytics. These

findings further demonstrate the Individual Defendants' awareness that safety concerns were materially impacting user trust and engagement.

87. ████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

88. ████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

---

[3] ████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████ detailed in the Dating Project Report, including:

a    Since at least 2016: Match Group has been aware of users reported for drugging, assaulting, or raping others on its platforms, according to internal documents. No public disclosure or widespread action was taken to share this information.

b    Since 2019: Match Group implemented its "Sentinel" system to track reports of rape and assault across apps like Tinder and Hinge, recording hundreds of such incidents weekly by 2022. Internal debates focused on limiting transparency to avoid legal risks.

c    September 28, 2020: A woman reported to Hinge that Stephen Matthews, a Denver cardiologist she met on the app, had raped her. Matthews remained active on the platform despite the report.

d    2020: Match Group publicly promised a transparency report on harms occurring on its platforms but has not released it as of February 2025, citing ongoing internal reviews.

e    Between summers of 2020 and 2021: Four additional women accused Matthews of drugging and/or raping them after meeting him on Match Group apps (including Hinge).

f    2021: Internal presentations at Match Group discussed safety reporting, with executives weighing minimal disclosure to meet potential legal requirements without fully informing the public.

g      2021–2022: Employee feedback highlighted frustrations with metrics-driven safety protocols that prioritized speed over thoroughness, potentially risking user lives. Pressure to handle investigations quickly was noted.

h      December 2022: A Facebook group post in Denver detailed negative experiences with Matthews, including women being offered drinks, blacking out, and being sexually assaulted. The thread grew to 150 comments, but Matthews stayed on the apps.

i      January 21, 2023: A young woman met Matthews on Hinge in Denver, was assaulted at his apartment after a date (involving drugging, filming, and physical restraint), and escaped. She reported the incident to Hinge, but Matthews was still active four days later.

j      January 25, 2023: Another woman reported Matthews for rape to Match Group, just days after the previous incident. No immediate removal occurred.

k      Early February 2023 (approximately one week after January 25): A survivor reported Matthews for rape to the police in Denver. It took nearly two months for his arrest in early April 2023.

89.   █████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████

90.   █████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████

91.

*February 23, 2024 Form 10-K*

92.     On February 23, 2024, the Company filed its annual report on Form 10-K with the SEC for the 2023 Fiscal Year (the "**2023 10-K**"). The 2023 10-K was signed by Defendants Kim, Swidler, McInerney, Bailey, Brenner, Dubey, McDaniel, Murdoch, Schiffman, Seymon, and Spoon and contained SOX certifications signed by Defendants Kim and Swidler. These certifications attested to the accuracy of the Company's financial reporting, the disclosure of any material changes to Match's internal control over financial reporting, and the disclosure of all known fraud, regardless of materiality.

93.     The 2023 10-K addressed the Company's risk disclosures using generic and boilerplate language, and notably omitted any reference to the ongoing and material risks affecting Tinder's user growth, which were already manifest at the time. The 2023 10-K included the following risk disclosure:

> *If we fail to retain existing users or add new users, our revenue, financial results, and business may be significantly harmed.*
>
> *Our financial performance has been and will continue to be significantly determined by our success in adding and retaining*

*users of our services*. In the past we have experienced, and expect to continue to experience, fluctuations in the size of our user base in one or more markets from time to time, particularly in markets where we have achieved higher penetration rates.

The size of our user base is also impacted by a number of other factors, including competitive products and services and global and regional business, macroeconomic, and geopolitical conditions. For example, wars in the Middle East and Ukraine have led to reduced supply as well as the decision to suspend our services in Russia.

***Further, if people do not perceive our services to be useful, we may not be able to attract or retain users***. In recent years, some users, particularly younger generations, have shown a decreased appetite for our services and those of our competitors due potentially to a number of factors. ***With each new generation of users, expectations of our services change and user behaviors and priorities shift***. As a result, we may need to further leverage our existing capabilities or advances in technologies like artificial intelligence ("AI"), or adopt new technologies, to improve our existing services or introduce new services in order to better satisfy existing users and to expand our penetration of what continues to be a large available new user market. However, there can be no assurances that further implementation of technologies like AI will enhance our services or be beneficial to our business and the introduction of new features or services to our existing services may have unintended consequences on our ecosystem, which could lead to fluctuations in the size of our user base. Additionally, in 2023 we began consolidating some of our legacy brands' platforms in order to decrease operating costs, which may result in changes to the user experience for some of our brands that some existing users may perceive negatively.

If we are unable to maintain or increase the size of our user base, our revenue

and other financial results may be adversely affected. Further, as the size of our user base fluctuates in one or more markets from time to time, we may become increasingly dependent on our ability to maintain or increase levels of monetization in order to grow revenue. Any significant decrease in user retention or growth could render our services less attractive to users, which is likely to have a material and adverse impact on our business, financial condition, and results of operations.

94.    This risk disclosure identified above were materially misleading because they presented as merely hypothetical, a risk that had already materialized at the time the statement was issued. Specifically, the Company was already "fail[ing] to ... add new users" which was already causing "significant[] harm" to its revenue and overall financial results. ██████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████

*2024 Proxy Statement*

95.    Match filed its 2024 Proxy Statement on April 29, 2024, signed by Defendants Kim, Bailey, Brenner, Dubey, Jones, McDaniel, McInerney, Murdoch, Rascoff, Schiffman, Seymon, and Spoon.

96.    The 2024 Proxy Statement solicited shareholders to, *inter alia*: (*i*) reelect Defendants Murdoch, Rascoff, Schiffman, and Seymon to the Board for a three-year term; (*ii*) approve, on a non-binding advisory basis, the compensation of Match's executive officers; (*iii*) approve the 2024 Stock Plan; and (*iv*) ratify the appointment of EY as the Company's independent registered public accounting firm for the 2024 Fiscal Year.

97.    The 2024 Proxy Statement explains that the 2024 Stock Plan would authorize the issuance of 6 million shares, in addition to any shares remaining available under the pre-existing 2017 Stock and Annual Incentive Plan that was set to expire in November 2025, and would remain in place for ten years.

98.    The 2024 Proxy Statement highlighted Company initiatives to "better drive sustainable long-term user and revenue growth" while failing to disclose the safety issues that the Company faced regarding Tinder's user growth:

In 2023, we focused on product innovation to help to better drive sustainable long-term user and revenue growth. At the same time, we implemented initiatives to deliver revenue acceleration throughout the year and continued to drive high levels of profitability and cash flow. We delivered solid financial results during 2023 while focusing on the foundation-building necessary to accelerate our strategic execution in 2024. We grew total revenue 6% to $3.4 billion in 2023. Tinder® Direct Revenue grew 7% year-over-year, driven by growth in revenue per payer ("RPP") due to pricing optimizations in the U.S. market and new weekly subscription offerings, partially offset by a decrease in Payers partially attributed to the pricing optimizations.

99.    With respect to the Company's internal controls, the 2024 Proxy Statement stated that the Audit Committee's responsibilities included "monitoring the integrity of Match Group's financial statements" and "the effectiveness of Match Group's internal control over financial reporting."

100.    Regarding "Risk Oversight," the 2023 Proxy Statement stated the following, in relevant part:

The Board's role in risk oversight of the Company is consistent with Match Group's leadership structure, with the Chief Executive Officer and other members of senior management having responsibility for assessing and managing the Company's risk exposure, and the Board and its committees providing oversight in connection with these efforts. Match Group management, including our Senior Vice President, Internal Audit, and our Risk, Controls and Compliance team, is responsible for assessing and managing Match Group's exposure to various risks on a day-to-day basis, which responsibilities include the conduct of an enterprise risk assessment of short-term, long-term and emerging risks, testing of key controls and procedures, and creation of appropriate risk management programs and policies. Management has developed and implemented guidelines and policies to identify, assess and manage significant risks facing the Company. In developing this framework, Match Group recognizes that leadership and success are impossible without taking risks; however, the imprudent acceptance of risks or the failure to appropriately identify and mitigate risks could adversely impact stockholder value. The Board is responsible for overseeing management in the execution of its responsibilities and for assessing Match Group's approach to risk management. While

the Board's oversight focuses on all material risks, the Board may focus more frequently on immediate areas of concern that represent significant emerging risks as identified by management.

101.    Defendants Kim, Bailey, Brenner, Dubey, Jones, McDaniel, McInerney, Murdoch, Rascoff, Schiffman, Seymon, and Spoon caused the 2024 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (*i*) Match failed to adequately address Tinder's known safety issues, including its failure to keep banned users off the platform; (*ii*) relatedly, the Company was experiencing undisclosed, significant challenges in driving user growth on Tinder than publicly acknowledged; (*iii*) as a result, there was a substantial risk that Tinder's MAU would not rebound in time for the Company's third quarter 2024 financial reporting; (*iv*) Tinder also was struggling with declining ARPU; and (*v*) the Individual Defendants were motivated by their own self-interest in seeking stockholder approval of the 2024 Stock Plan. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

102.    The 2024 Proxy Statements was further false and misleading because it did not disclose the Company's pervasive safety issues outlined in the Dating Project Report. Among other things, the 2024 Proxy Statement did not mention the pervasive safety problems on Tinder, including the presence of predators and bad actors, inadequate moderation systems, and the resulting decline in user trust and retention. As revealed in the Dating Project Report, Match had been aware of these issues since at least 2019, including the case of Stephen Matthews, a Denver cardiologist reported for rape in 2020, who was not banned from Tinder or Hinge until 2023—allowing him continued access to the platforms for years, during which he raped at least 14 more women.

103.    By failing to disclose these safety issues, the 2024 Proxy Statement misrepresented the operational health of Tinder, a key revenue driver for Match. The statement's silence on these

risks misled shareholders voting on director elections (and the 2024 Stock Plan, as these issues materially affected user growth and financial performance, later contributing to a 9% year-over-year MAU decline in Q2 and Q3 2024.

104.    The undisclosed safety issues also directly undermined the justification for the 2024 Stock Plan, which allocated 6,000,000 shares for executive and director compensation. Shareholders were not informed that the Board and management's failure to address persistent and well-documented safety risks posed a serious threat to the Company's long-term value, rendering the approval of additional equity-based compensation misleading and inappropriate under the circumstances.

105.    The 2024 Proxy Statement represented that the Board and its committees exercised robust risk oversight, stating that the Board oversees management's risk management efforts, including enterprise risk assessments conducted by the Senior Vice President of Internal Audit and the Risk, Controls, and Compliance team. However, the Dating Project Report belied these representations by showing that the Board was aware of serious safety issues—through the 2019–2020 public investigations, internal user complaint data, and internal reporting—but failed to take adequate corrective measures. Specifically, the Board did not implement effective ban enforcement protocols or ensure sustained resourcing of the trust-and-safety function. The termination of the Garbo background check partnership in 2023 and the dismantling of the safety team by 2024—initiated well before the Proxy Statement was issued—further underscore the Board's failure to exercise the risk oversight it claimed to maintain.

106.    The 2024 Proxy Statement's assertion of effective risk oversight was materially false and misleading, as the Board knowingly permitted critical safety risks to persist unaddressed, directly contributing to user dissatisfaction and sustained declines in MAU. This misrepresentation

deprived shareholders of the ability to accurately evaluate the Board's performance, particularly when voting to reelect directors Murdoch, Rascoff, Schiffman, and Seymon and to approve the 2024 Stock Plan. Absent disclosure of the Board's failure to mitigate these material risks, shareholders were unable to cast fully informed votes.

107.    The 2024 Proxy Statement highlighted initiatives to "better drive sustainable long-term user and revenue growth" and noted Tinder's 7% direct revenue growth in 2023, but failed to disclose that safety issues were a significant driver of user dissatisfaction and declining MAU. The Dating Project Report cited a 2023 study from Brigham Young University showing violent dating app-related assaults, █████████████████████████████████████████████

████████████████████████████████████████████████

108.    By failing to disclose the connection between persistent safety issues and user churn, the 2024 Proxy Statement presented an overly optimistic portrayal of Tinder's growth prospects, thereby misleading shareholders about the true risks to the Company's financial performance. This omission materially impacted shareholder votes on both the 2024 Stock Plan and the reelection of directors, as investors were unaware of the significant operational challenges eroding Tinder's user base. These undisclosed issues were later confirmed by the Company's disappointing Q3 results and a 17.8% drop in stock price on November 7, 2024, underscoring the materiality of the omitted information.

109.    The 2024 Proxy Statement solicited approval for the 2024 Stock Plan (Pages 6, 69-70), comprising 6,000,000 shares to replace the 2017 plan, without disclosing that the Individual Defendants were "improperly interested" in increasing their compensation. As disclosed in the Dating Project Report, the Company's cost-cutting (*e.g.*, ending Garbo, reducing safety staff) was

adopted to boost profits despite known safety risks, evidenced a prioritization of executive and director financial gain over user safety and Company value.

110.    While the Proxy Statement itself does not include SOX certifications, it incorporates the 2023 10-K and Q1 2024 10-Q, where Kim and Swidler certified effective disclosure controls and no material omissions. The Dating Project Report showed that the Individual Defendants knew of safety issues (*e.g.*, complaints since 2019, Garbo termination in 2023) that materially impacted MAU, yet failed to disclose them, rendering these certifications misleading.

111.    The Dating Project Report and prior lawsuits and regulatory activity establish that Match Group knew of Tinder's safety issues by April 2024, including:

- *Predator Activity*: Frequent assault complaints and weak ban enforcement allowing bad actors to rejoin.

- *Suppressed Data*: Withholding of a 2020 transparency report documenting harm.

- *Reduced Safety Measures*: Termination of the Garbo partnership in 2023 and safety team layoffs, driven by cost-cutting.

- *Legal/Regulatory Risks*: A 2017 lawsuit and 2022 ID verification bill highlighted liability, known to the Board and management.

- *User Dissatisfaction*: A study by Brigham Young University and internal feedback showed safety-driven churn, contributing to MAU declines by Q2 2024. These issues were material, as they drove user distrust and financial losses (e.g., 17.8% stock drop), yet were not disclosed in the 2024 Proxy Statement, misleading shareholders voting on the 2024 Stock Plan and other proposals.

112.    Accordingly, the 2024 Proxy Statement was materially false and misleading, as it failed to disclose ongoing safety issues on Tinder, misrepresented the Board's risk oversight and ethical compliance, omitted material information regarding user growth challenges linked to safety failures, and concealed conflicts of interest related to the 2024 Stock Plan. It also relied on

misleading SOX certifications to falsely assure shareholders of effective internal controls and accurate disclosures. In light of the findings set forth in the Dating Project Report, these omissions and misrepresentations deprived shareholders of the critical information necessary to make informed decisions regarding the approval of the 2024 Stock Plan, the election of directors, and the ratification of the Company's independent auditor, thereby violating the Individual Defendants' fiduciary duties of loyalty, good faith, and candor.

113. ████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████

### *May 8, 2024 Form 10-Q*

114. On May 8, 2024, Match filed its quarterly report for the quarter ended March 31, 2024 (the "**Q1 2024 10-Q**"). The Q1 2024 10-Q was signed by Defendant Swidler and contained SOX certifications signed by Defendants Kim and Swidler attesting to the accuracy of financial reporting, the disclosure of any material changes to Match's internal control over financial reporting, and the disclosure of all fraud.

115. The Q1 2024 10-Q incorporated the risk disclosures from the 2023 10-K discussed above, and were false and misleading for the same reasons.

### *May 8, 2024 Earnings Call*

116. That same day, the Company hosted an earnings call with investors to discuss the quarterly results for the first quarter, during which Defendant Kim discussed the issues that the

Company had experienced generating user growth on Tinder, understating the relevant issues. In full, Defendant Kim stated:

> Tinder's international scale and reach has never been matched by any other dating app. And it's critical that we keep the ecosystem vibrant. ***For example, Tinder took decisive action by changing its community guidelines and moderation practices mid-last year, which better enabled the removal of users who are not on the app for its intended purposes. While the improvements to the ecosystem and benefits to the brand are undeniable, these actions did contribute to some of Tinder's MAU declines over the past nine months.***
>
> We believe that actions like these are in the best interest of Tinder's long-term success. ***So we are willing to accept fewer MAU in the short-term*** to create a safer ecosystem and better outcomes for our daters. Diving a little deeper into Tinder, we have heard loud and clear that some users, especially the Gen Z cohort, are looking for more from their dating apps. We have been In this business a long time, and we have consistently adapted our offerings to best serve the needs of different generations and we understand and recognize that expectations of apps are changing.
>
> ***Tinder is working tirelessly to execute against their strategy, and I'm incredibly confident in the team's ability to satisfy these evolving expectations that users have. By the end of the year, we expect to have a significantly improved product.*** Similarly, pressures on discretionary consumer spending, especially among Tinder's younger user base, have negatively impacted Tinder's a la carte revenue. The team is doubling down on its efforts to improve the efficacy of its current ALC features and introduce new offerings at affordable price points. We expect to see improvements in ALC trends by the back half of the year. We know we have work to do to satisfy every new generation of daters. The Tinder team is working to improve the dating journey at every point of the experience. ***Through innovation, especially with AI, we believe we can improve the quality of profiles, matching outcomes, safety features, and the post-match experience to make the entire Tinder platform more modern and deliver on their brand promise***.
>
> I've asked our Chief Technology Officer and his central innovation team to work even more closely with Tinder's product team to expedite all these efforts which are underway. ***And given Tinder's vast scale and knowledge about relationships and dating, there is no dating app better positioned to take advantage of these***

***advances in technology***. Tinder has become an industry defining highly profitable business over the past decade. We have been innovating to solve some of the user pain points. As a result, we will have a healthier, more satisfying, and ultimately more valuable experience for daters to enjoy.

***And I am confident that Tinder's momentum will come back. We believe we have real market opportunity and the right teams and strategies in place to get to that next level of growth***. And we are determined to deliver that for all of our stakeholders. We continue to see significant growth runway at Hinge and our emerging brands portfolio. ***We're executing on our turnaround plan for Tinder and our central innovation teams are bringing renewed vigor to product innovation***. We are excited to continue this work as giving people new, exciting ways to connect is what motivates us every day. And with that, let me turn it over to Gary.

117. 

118.

119. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████

*July 31, 2024 Earnings Call*

120.    On July 31, 2024, the Company hosted an earnings call with investors to discuss the quarterly results for the second quarter of the 2024 Fiscal Year (the "**Q2 2024 Earnings Call**"), during which Defendant Swidler discussed Tinder's declining MAU, but undersold the impact they really had on the Company, stating:

> Focusing on user trends, we saw sequential stability in Tinder's MAU, which were down 9% year-over-year in Q2, as was the case in Q1. MAU at Tinder have now been relatively stable since March. ***A large decline in MAU began in July of last year, driven in large part by changes we made to Tinder's trust and safety policies to remove people who are not truly on the app to connect that has now begun to stabilize***.
>
> With much of this impact now behind us and given Tinder's various ongoing product and marketing initiatives, ***we're confident Tinder's year-over-year MAU declines should continue to moderate as this year passes***.

121.    During his scripted remarks on the Q2 2024 Earnings Call, Defendant Kim also underplayed the issues regarding Tinder's MAU, stating:

> Over the last several quarters, Tinder has been working hard to improve the user experience, and we're now starting to see initial signs of progress. User and payer trends are stabilizing, and we expect them to continue to improve from here. ***We expect strong sequential payer growth in Q3 and better year-over-year MAU trends in the second half of the year***.
>
> As the largest dating app in the world, it's Tinder's job to deliver for its users, which in turn helps attract new users. ***Tinder is building on its fun legacy and its iconic swipe experience by continuing to increase authenticity and realness and by setting the industry***

*standard for trust and safety*. We believe this will address some of the concerns that users have been vocal about more recently.

122.    During the question-and-answer portion of the Q2 2024 Earnings Call, Defendant Kim responded to a question regarding the stabilization of Tinder's user growth in the quarter, stating:

> *Nathan Feather – Morgan Stanley, Analyst*: Hey, everyone. **Congrats on the stabilization and Tinder user growth in the quarter**. Is there anything outsized that led to that stabilization or more so stacking of a variety of individual improvements? And can you help us contextualize how much of that is due to new user trends versus retention? Thank you.
>
> *Defendant Kim*: Thanks, Nathan, for that question. I really like how you framed it around stacking Tinder product improvements. Our work is really a combination of product initiatives building on each other over time. And this is reinforced with really strong marketing that is helping drive stabilization and start contributing to improvements on the back half of this year. The trust and safety moves that we made last year are one of – is a great example of stacking initiatives, which we know were the right decisions. And the good news is we've worked through a lot of those – a lot of that noise and has led to better user outcomes and say that the user base has stabilized, retention is improving and growing and we're making strides in top of funnel again. It's a really exciting time period for Tinder.

123.    The statements made during the Q2 2024 Earnings Call were materially false and misleading when made, as they omitted material adverse facts concerning the Company's business, operations, and prospects. Specifically, these statements failed to disclose that: (*i*) Match failed to adequately address Tinder's known safety issues, including its failure to keep banned users off the platform; (*ii*) relatedly, the Company was experiencing undisclosed, significant challenges in driving user growth on Tinder than publicly acknowledged; (*iii*) as a result, there was a substantial risk that Tinder's MAU would not rebound in time for the Company's third quarter 2024 financial reporting; (*iv*) Tinder also was struggling with declining ARPU; and (*v*) the Individual Defendants

were motivated by their own self-interest in seeking stockholder approval of the 2024 Stock Plan. Accordingly, the Company's public statements were materially false, misleading, and/or lacked a reasonable basis at all relevant times.

### August 1, 2024 Form 10-Q

124.    On August 1, 2024, Match filed its quarterly report on Form 10-Q with the SEC for the quarterly period ended June 30, 2024 (the "**Q2 2024 10-Q**"), which was signed by Defendant Swidler and contained SOX certifications signed by Defendants Kim and Swidler attesting to the accuracy of financial reporting, the disclosure of any material changes to Match's internal control over financial reporting, and the disclosure of all fraud. The Q2 2024 10-Q incorporated the risk disclosures from the 2023 10-K detailed above, and which were false and misleading for the same reasons.

## THE TRUTH EMERGES

125.    The truth began to emerge on November 6, 2024 when the Company issued the Q3 2024 Shareholder Letter, when finally disclosed that, despite the Company's prior assertions to the contrary, Tinder's MAU were down year-over-year in the third quarter, stating:

> Tinder MAU was down 9% Y/Y in Q3, which was the same rate of decline as in Q2, falling short of our expectations for continued improvement in Y/Y trends. From mid-September through October, we saw more pressure on new users (registrations and reactivations) than we expected, which has led to pressure on MAU.
>
> Tinder's primary focus remains driving its product transformation efforts forward to improve ecosystem health and user outcomes, which we believe are necessary for durable improvements in user, Payer, and revenue trends

126.    The following day, on November 7, 2024, Investopedia published a report titled *Match Group Stock Slips as Fourth Quarter Outlook Disappoints*. The report discussed the decline

in the Company's share price being the result of the disappointing revelation in the Q3 2024

Shareholder Letter regarding Tinder's MAU, despite strong performance from Hinge:

> Shares of online dating giant [Match] tumbled Thursday morning despite a third-quarter earnings beat released after the bell Wednesday.
>
> * * *
>
> Revenue and downloads of Hinge continued to grow, ***but Match said Tinder Direct revenue came in below its own expectations, as the app's monthly active users (MAUs) declined 9% from the same time last year and its revenue per payer (RPP) grew less than expected. Some new features tested with Tinder users in the quarter negatively impacted subscription revenue, which the company said will likely also have an impact on fourth quarter revenue***.

127.    Also on November 7, 2024, the Company hosted an earnings call with investors

and analysts to discuss the third quarter results (the "**Q3 2024 Earnings Call**").

128.    On the Q3 20242 Earnings Call, Defendant Kim addressed the elephant in the room

that was the Tinder MAU drop, stating:

> As I mentioned during our last call, shareholders rightfully expect both short and long-term results. In the short-term, Tinder's direct revenue was slightly below our expectations driven by the under delivery of certain optimizations. However, Tinder added 311,000 payers sequentially and declined by only 4% year-over-year. This was well above our outlook provided in late July.
>
> ***While we're pleased with the results on payers, we saw less progress on Tinder MAU than we expected***. Tinder remains focused on the longterm testing several important new features aimed at cleaning up its ecosystem and improving user outcomes. This includes testing mandated face photos in several markets.
>
> * * *
>
> We're pleased with the progress we've seen recently at Tinder on product execution, but are far from done. The team is working tirelessly pushing forward with initiatives to drive Tinder's transformation forward. ***At the same time, we're clear eyed that Tinder's progress will not always be linear because we know that transformation, such as these, take time***.

129.    Defendant Swidler also touched on the Tinder MAU drop during his own scripted remarks on the Q3 2024 Earnings Call, stating:

> Tinder MAU were down 9% in the quarter consistent with Q2 trends. ***We had expected to see improvement in year-over-year MAU trends in the quarter. However, in mid-September, we began to see weaker new user trends, which includes new registrations and reactivations of lapsed users than is typical at this time of year, a trend that has stabilized in October.***
>
> The pressure on new users was largely confined to iOS. We are working collaboratively with Apple to investigate whether it's related to the introduction of iOS 18 in mid-September, certain trust and safety enhancements we made or another cause. ***This in turn has caused pressure on Tinder MAU***. We are working on a number of initiatives to improve this trend.

130.    Lastly, during the question-and-answer portion of the Q3 2024 Earnings Call, Defendant Kim responded to a question regarding what was going on with Tinder's issues, stating:

> *Ross Sandler – Barclays – Analyst*: Great. So I guess, Gary, starting with the Tinder top of funnel trends, could you just elaborate a little bit more on what's going on? You mentioned iOS and a few other things around top of funnel and the weaker MAU at the end of 3Q and then what's happening right now in 4Q? And as we turn ahead to '25, other than cranking on marketing, what other trends might help drive top of funnel at Tinder? And I guess it's related to this, did you feel like Tinder's operating margin at 52% is at the right level or how do we think about that long-term? Thank you.
>
> *Defendant Kim*: Thanks, Ross. This is BK. I'm going to handle the first part of that question and Gary can jump in on the margin side. So we did see a step back in Tinder's MAU growth starting in mid-September. And as Gary mentioned in his comments, we're investigating several possible causes. This includes the introduction of iOS 18 and some recent trust and safety enhancements that may have added to friction for daters. While I believe this step back isn't what we wanted, we don't see this as a long term structural shift. Our team's top priority remains driving product innovation and that's where Tinder's focus is. We know we need to clean up the ecosystem and create better experiences, especially for younger users and women and we're working on it, but meaningful changes do take time. Now you mentioned marketing and it's definitely key

to reinforce Tinder's brand and promoting new products. But marketing alone will not drive top of funnel growth. That's why our focus is on product-led strategies to build sustainable engagement. We're excited for Investor Day, so we can lay out our product roadmap and discuss our plans to get Tinder back on track. We're confident in these plans

131.   On this news, the price per share of Match's stock declined 17.8% in one day, from a close of $37.88 per share on November 6, 2024, to a close of $31.11 on November 7, 2024. It continued to fall an additional $0.55 per share, or 1.8%, to close at $30.56 on November 8, 2024.

132. ████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

██████████

## DAMAGES TO MATCH

133.   As a direct and proximate result of the Individual Defendants' conduct, Match has lost and will continue to lose and expend many millions of dollars.

134.   Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

135.   Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

136.    Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

137.    Such losses include the Company's overpayment of over $140 million for repurchases of its own stock during the period when the Company's stock price was artificially inflated due to the false and misleading statements discussed above.

138.    Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

139.    As a direct and proximate result of the Individual Defendants' conduct, Match has also suffered and will continue to suffer a loss of reputation and goodwill, as well as a "liar's discount" that will plague the Company's stock in the future due to the Company's and the Individual Defendants' misrepresentations.

## DEMAND FUTILITY

140.    Plaintiff repeats and realleges each and every allegation above as though fully set forth herein.

141.    Plaintiff brings this action derivatively and in the right and for the benefit of Match to redress the Individual Defendants' breaches of fiduciary duty and other misconduct.

142.    Plaintiff currently is a stockholder of Match, was a stockholder of Match at the time of the wrongdoing alleged herein, and has been a stockholder of Match continuously since that time.

143.    Plaintiff will adequately and fairly represent the interests of Match in enforcing and prosecuting its rights.

144.    Plaintiff has not made a demand on the Board to institute this action as doing so would be a futile and useless act because at least half of the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

145.    At the time that Plaintiff commenced this action, the Board consisted of 11 directors: Defendants (*i*) Bailey; (*ii*) Brenner; (*iii*) Dubey; (*iv*) Jones; (*v*) McDaniel; (*vi*) McInerney; (*vii*) Rascoff; (*viii*) Schiffman; (*ix*) Seymon; and non-parties (*x*) Darrell Cavens; and (*xi*) Kelly Campbell (the "Demand Board").

146.    Demand is excused because nine members of the Demand Board – Defendants Bailey, Brenner, Dubey, Jones, McDaniel, McInerney, Rascoff, Schiffman, and Seymon – *i.e.,* a majority, face a substantial likelihood of liability for failing to maintain adequate controls over the safety of its platforms despite being on notice or recklessly failing to know that its safety protocols were insufficient; failing to maintain adequate controls over the Company's financial reporting; and causing the Company to make false and/or misleading statements and omissions in its public filings and disclosures as set forth above.

147.    Moreover, seven members of the Demand Board – Defendants Bailey, Brenner, Dubey, McDaniel, McInerney, Schiffman, and Seymon – *i.e.,* a majority, solicited the 2023 Proxy Statement which, *inter alia*, solicited stockholder approval for the reelection of Defendants Dubey, McDaniel, and McInerney as directors. The misrepresentations and omissions set forth above were material to a reasonable investor's decision about how to vote. As such, the foregoing misrepresentations and omissions prevented stockholders from casting an informed vote. Defendants Bailey, Brenner, Dubey, McDaniel, McInerney, Schiffman, and Seymon thus face a

substantial likelihood of liability for causing the Company to make the foregoing material misrepresentations and/or omissions in the 2023 Proxy Statement despite being on notice or recklessly failing to know that the Company's safety protocols were insufficient.

148.    Finally, nine members of the Demand Board – Defendants Bailey, Brenner, Dubey, Jones, McDaniel, McInerney, Rascoff, Schiffman, and Seymon – *i.e.,* a majority, solicited the 2024 Proxy Statement which, *inter alia*, solicited stockholder approval for (*i*) the reelection of Defendants Rascoff, Schiffman, and Seymon as directors, and (*ii*) approval of the 2024 Stock Plan. The misrepresentations and omissions set forth above were material to a reasonable investor's decision about how to vote. As such, the foregoing  misrepresentations and omissions prevented stockholders from casting an informed vote. Defendants Bailey, Brenner, Dubey, Jones, McDaniel, McInerney, Rascoff, Schiffman, and Seymon thus face a substantial likelihood of liability for causing the Company to make the foregoing material  misrepresentations and/or omissions in the 2024. Proxy Statement despite being on notice or recklessly failing to know that the Company's safety protocols were insufficient. Additionally, these nine directors are eligible to receive substantial equity awards under the 2024 Stock Plan, a material personal benefit resulting from their misconduct.

149.    Accordingly, it would be futile to ask the Demand Board to bring the claims asserted herein.

## CLAIMS FOR RELIEF

## COUNT I

**Against the Individual Defendants**
***for Violations of Section 14(a) of the Exchange Act***

150.    Plaintiff repeats and realleges each and every allegation above as if set forth in full herein.

151.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

152.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

153.    Under the direction and watch of Defendants Kim, Bailey, Brenner, Dubey, McDaniel, McInerney, Murdoch, Schiffman, Seymon, and Spoon, the 2023 Proxy Statement failed to disclose that the Board and its committees were not adequately exercising their risk oversight functions and were causing or permitting the Company to issue false and misleading statements. The 2023 Proxy Statement also failed to disclose, *inter alia*, that: (*i*) Match failed to adequately address Tinder's known safety issues, including its failure to keep banned users off the platform; (*ii*) relatedly, the Company was experiencing undisclosed, significant challenges in driving user growth on Tinder than publicly acknowledged; (*iii*) as a result, there was a substantial risk that Tinder's MAU would not rebound in time for the Company's third quarter 2024 financial

reporting; and (*iv*) Tinder also was struggling with declining ARPU. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times. As a result of the material misstatements and omissions contained in the 2023 Proxy Statement, Company shareholders voted, *inter alia*, to reelect Dubey, McDaniel, and McInerney to the Board for a three-year term, thereby allowing them to continue breaching their fiduciary duties to the Company.

154.    In the exercise of reasonable care, Defendants Kim, Bailey, Brenner, Dubey, McDaniel, McInerney, Murdoch, Schiffman, Seymon, and Spoon should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2023 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2023 Proxy Statement.

155.    Under the direction and watch of Defendants Kim, Bailey, Brenner, Dubey, Jones, McDaniel, McInerney, Murdoch, Rascoff, Schiffman, Seymon, and Spoon, the 2024 Proxy Statement failed to disclose, *inter alia*, that the Board and its committees were not adequately exercising their risk oversight functions and were causing or permitting the Company to issue false and misleading statements.

156.    The 2024 Proxy Statement also failed to disclose that: (*i*) Match failed to adequately address Tinder's known safety issues, including its failure to keep banned users off the platform; (*ii*) relatedly, the Company was experiencing undisclosed, significant challenges in driving user growth on Tinder than publicly acknowledged; (*iii*) as a result, there was a substantial risk that Tinder's MAU would not rebound in time for the Company's third quarter 2024 financial reporting; (*iv*) Tinder also was struggling with declining ARPU; and (*v*) the Individual Defendants

were motivated by their own self-interest in seeking stockholder approval of the 2024 Stock Plan to increase their future compensation. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times. As a result of the material misstatements and omissions contained in the 2024 Proxy Statement, Company shareholders voted, *inter alia*, to reelect Defendants Rascoff, Schiffman, and Seymon to the Board, and to approve the 2024 Stock Plan.

157.    In the exercise of reasonable care, Defendants Kim, Bailey, Brenner, Dubey, Jones, McDaniel, McInerney, Murdoch, Rascoff, Schiffman, Seymon, and Spoon, should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2024 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2024 Proxy Statement.

158.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2023 Proxy Statement and the 2024 Proxy Statement.

159.    Plaintiff, on behalf of Match, has no adequate remedy at law.

## COUNT II

### Against Defendants Kim and Swidler
### *for Contribution Under Sections 10(b) and 21D of the Exchange Act*

160.    Plaintiff repeats and realleges each and every allegation above as if set forth in full herein.

161.    Match, Defendants Kim and Swidler are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities

laws, the Company's liability will be in whole or in part due to Defendants Kim and Swidler's willful and/or reckless violations of their obligations as officers and/or directors of Match.

162.    Defendants Kim and Swidler, because of their positions of control and authority as then-CEO and then-President of Match, respectively, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Match, including the wrongful acts complained of herein and in the Securities Class Action.

163.    Accordingly, Defendants Kim and Swidler are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

164.    As such, Match is entitled to receive all appropriate contribution or indemnification from Defendants Kim and Swidler.

## COUNT III

### Against the Individual Defendants
### *for Breach of Fiduciary Duties*

165.    Plaintiff repeats and realleges each and every allegation above as if set forth in full herein.

166.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Match's business and affairs.

167.    Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

168.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual

Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Match.

169. In breach of their fiduciary duties owed to Match, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (*i*) Match failed to adequately address Tinder's known safety issues, including its failure to keep banned users off the platform; (*ii*) relatedly, the Company was experiencing undisclosed, significant challenges in driving user growth on Tinder than publicly acknowledged; (*iii*) as a result, there was a substantial risk that Tinder's MAU would not rebound in time for the Company's third quarter 2024 financial reporting; (*iv*) Tinder also was struggling with declining ARPU; and (*v*) the Individual Defendants were motivated by their own self-interest in seeking stockholder approval of the 2024 Stock Plan. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

170. In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and misleading statements and/or omissions of material fact referenced herein, which renders them personally liable to the Company for breaching their fiduciary duties.

171. In further breach of their fiduciary duties, the Individual Defendants failed to exercise adequate oversight over the Company's risk management despite being on notice or recklessly failing to know that its safety protocols were insufficient.

172. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

173.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Match has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

174.    Plaintiff, on behalf of Match, has no adequate remedy at law.

## COUNT IV

### Against the Individual Defendants
### *for Unjust Enrichment*

175.    Plaintiff repeats and realleges each and every allegation above as if set forth in full herein.

176.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Match.

177.    The Individual Defendants either benefitted financially from the improper conduct, received bonuses, stock options, or similar compensation from Match that was tied to the performance or artificially inflated valuation of CrowdStrike, or received compensation or other payments that were unjust in light of the Individual Defendants' bad-faith conduct. This includes lavish compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

178.    Plaintiff, as a shareholder and representative of the Company, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

179.    Plaintiff, on behalf of Match, has no adequate remedy at law.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Match, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have violated the relevant securities laws and breached their fiduciary duties to Match;

(c)    Determining and awarding to Match the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Match and the Individual Defendants to take all necessary actions to reform and improve Match's corporate governance and internal procedures to comply with applicable laws and to protect Match and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote amendments to the Company's Bylaws and/or Certificate of Incorporation as may be necessary to ensure proper corporate governance policies:

(e)    Awarding Match restitution from Individual Defendants, and each of them;

(f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)    Granting such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated:  August 4, 2025                    Respectfully submitted,

                                          **LEVI & KORSINSKY, LLP**

                                          By:/s/ *Adam M. Apton*
                                          Adam M. Apton (State Bar No. 316516)
                                          515 South Flower Street, 18th & 19th Floors
                                          Los Angeles, CA 90071
                                          Telephone: (213) 985-7290
                                          Facsimile: (212) 363-7171
                                          aapton@zlk.com

                                          **LEVI & KORSINSKY, LLP**
                                          Gregory M. Nespole (*pro hac vice* forthcoming)
                                          Daniel Tepper (*pro hac vice* forthcoming)
                                          Correy A. Suk (*pro hac vice* forthcoming)
                                          33 Whitehall Street, 27th Floor
                                          New York, NY 10004
                                          Telephone: (213) 363-7500
                                          Facsimile: (212) 363-7171
                                          gnespole@zlk.com
                                          dtepper@zlk.com
                                          csuk@zlk.com

                                          *Attorneys for Plaintiff*

## **VERIFICATION**

I, Ned Habedus, do hereby verify that I am a holder of common stock of Match Group, Inc. and was a holder of such stock at the time of the wrongs complained of in the foregoing Verified Stockholder Derivative Complaint (the "Complaint"). I have reviewed and authorized the filing of the Complaint. All of the averments in the Complaint regarding me are true and correct upon my personal knowledge and, with respect to the remainder of the averments, are true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Date: July ___18___, 2025

_____
Ned Habedus